# Richmond

JAMES C. HAMMER v. COMMONWEALTH OF VIRGINIA.

June 13, 1966.

Record No. 6154.

Present, All the Justices.

*Harry J. Kostel* and *Herbert H. Bateman* (*Jones, Blechman, Woltz & Kelly*, on brief), for the plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for the Commonwealth.

GORDON, J., delivered the opinion of the court.

The Commonwealth charged Hammer with entering an apartment at 225 Revere street, in the city of Newport News, on the night of May 12, 1964 with intent to commit rape. He pleaded not guilty and waived a jury upon advice of court-appointed counsel. The trial judge found Hammer guilty and sentenced him to a term of four years, to run concurrently with another sentence.

## I

Hammer asks us to reverse the conviction because his incriminating statement was admitted in evidence. He says the statement was inadmissible because he made it without assistance of counsel and under duress.

The police arrested Hammer on the night of May 12, and he made the incriminating statement on May 14. So we will begin our statement of the facts with a description of the events leading to Hammer's arrest, followed by the events through the making of the incriminating statement.

At about 8:30 p.m. on May 12, detective sergeant Calhoun of the Newport News police force heard detectives in another police car acknowledge a radio call to go to 225 Revere street "in reference to a complaint". Sergeant Calhoun then proceeded north on Warwick boulevard. Shortly thereafter, he received a description of the person who had entered 225 Revere street and had "attempted to

assail a woman there in the house". Sergeant Calhoun said the person was described as wearing a blue hooded sweatshirt, woolen or cotton gloves, dark pants and tennis shoes. He had a knife in his possession.

As sergeant Calhoun was driving north on Warwick boulevard, he saw "a subject fitting this description" walking along the boulevard at a point 1 or 1½ miles from 225 Revere street. This "subject" was Hammer. Sergeant Calhoun drove around the block twice before he saw Hammer again, standing on the opposite side of the boulevard. Sergeant Calhoun said "there he is", and Hammer "broke and ran between two houses". Sergeant Calhoun turned left at the next intersection, drove a short distance down the street, and got out of his car. He ran up a driveway "in hopes that the subject would come that way". He "heard some noise in the weeds and bushes and . . . just waited and then . . . heard a creak on the fence". Hammer jumped over the fence. Sergeant Calhoun drew his revolver and arrested him. It was then about 8:45 p.m.

Hammer was wearing a blue sweatshirt with a hood, dark pants and tennis shoes. Sergeant Calhoun found a pair of cotton or woolen gloves in the pocket of the sweatshirt. A hunting knife in a brown leather sheath was found later, lying on the ground in the immediate area of the arrest.

Hammer told sergeant Calhoun he ran because Calhoun was in an unmarked black Ford, and earlier in the night boys in a black Ford had "used some abusive language toward him [Hammer]".

Sergeant Calhoun drove with Hammer to 225 Revere street, where he found lieutenant Hiser and another officer. Hammer remained in the police car until he was taken to police headquarters at 10:00 or 10:30 p.m. Lieutenant Hiser advised Hammer that he had been arrested "in reference to a complaint we had in the Ferguson Park area [where 225 Revere street is located] where the subject had broken into the home and threatened a woman with a knife". Hammer did not ask permission "to get in touch with anybody". He told lieutenant Hiser only that he wished to go home, that he "would like to be home when his wife got there" after work.

In the effort to identify the assailant, the officers conducted two voice tests on the night of May 12, one outside the prosecutrix' apartment shortly after Hammer's arrest and the other at police headquarters later that night. Each time the officers asked the prosecutrix if she could identify the assailant's voice after listening to

words spoken by Hammer and policemen, who were not visible to her. After the first test, she said "I'm not sure. I can't tell. I'd like to hear them again." After the second test, she did not identify Hammer's voice definitely, but at one time after he spoke she said "it sounded like the voice".

Later that night, Hammer was "lined-up" beside two officers in the presence of the prosecutrix. She identified Hammer as the assailant. He was in the same attire as at the time of his arrest. The officers had removed their police jackets, and they were apparently wearing sport coats. The faces of the three men were partially obscured by handkerchiefs.

Lieutenants Shanz and H. D. Martin began questioning Hammer when they came on duty at approximately 11:30 p.m. on May 12. After about thirty minutes of questioning, lieutenant Martin decided to bring other witnesses to headquarters, that is, persons who had reported "break-ins" in the recent past. Lieutenant Shanz testified Hammer "was faced [on the night of May 12-13] by the witnesses that picked him out of the lineup and was told to his face that he had raped them or attempted to rape as the case may have been". Lieutenants Shanz and Martin were engaged in questioning Hammer or in "getting witnesses in for one thing or another" until after 3:00 a.m. on May 13.

Hammer was taken to the desk sergeant for "booking" at about 3:20 a.m. The desk sergeant asked lieutenant Shanz what Hammer was charged with, "and I [Shanz] told him what he was charged with". The desk sergeant recorded four counts of rape, three counts of attempted rape and seven burglaries on his charge book, but he did not record the names of the victims. Lieutenant Shanz testified that when Hammer was "booked" he was asked if he wished to make a phone call, but Hammer made no call. After Hammer was "booked", he was taken upstairs to jail.

Hammer was brought downstairs from his cell sometime between 5:00 and 6:30 a.m. on May 13, when he was shown allegedly stolen articles that had been seized by officers who had searched his home. Then Hammer was taken back to his cell, where he remained until approximately 7:30 a.m. Hammer was questioned between 7:30 and 9:00 a.m. He did not admit anything, but lieutenant H. D. Martin said "He started making statements that he vaguely remembered certain things".

Hammer appeared before the municipal judge in open court at

9:00 a.m. on May 13. The judge advised Hammer that he was accused of four rapes, three attempted rapes and seven burglaries, that the charges were serious, and that he was entitled to a continuance so that he might make whatever arrangements he felt necessary for trial. Hammer asked no question, and he made no request and no complaint. The hearing was continued until May 22 on motion of the Commonwealth.[1]

After the appearance before the municipal judge on May 13, lieutenants. Shanz and H. D. Martin questioned Hammer at police headquarters for thirty or thirty-five minutes. From approximately 10:00 a.m. to 2:30 p.m., lieutenant Shanz and another officer drove with Hammer to various places in the city of Newport News where offenses had occurred. During this interval, Hammer's father and brother came to the police station and asked to see him. They testified that lieutenant F. L. Martin told them "it was impossible to see him now".[2]

Beginning at 2:30 p.m., lieutenant Shanz "took statements from him [Hammer] in various cases" but he said Hammer made no admission of guilt. These statements were not introduced in evidence. Hammer was taken back to jail at 4:00 p.m.

Lieutenant Mapes brought Hammer from jail to chief Peach's office at about 9:00 p.m. on May 13. Chief Peach alone talked to Hammer for about twenty minutes. Then lieutenant Mapes returned, and chief Peach left after telling Hammer "you can tell him [Mapes] the truth about these matters". Lieutenant Mapes told

_____

(1) The municipal judge advised Hammer "with relation to an attorney", but the testimony does not disclose the precise advice given. There is no evidence that Hammer requested the judge to appoint counsel to represent him. At that time there was no statutory provision for the appointment of counsel to represent an accused at a preliminary hearing. Statutes (which became effective June 26, 1964) now provide that a person charged with a felony shall be entitled to representation by counsel at every stage of the proceedings against him in any court, and that counsel shall be appointed to represent an indigent defendant at his preliminary hearing. (Va. Acts of Assembly 1964, ch. 657 at 994-95; Va. Code Ann. §§ 19.1-241.1 and 19.1-241.3 (Supp. 1964)).

(2) Lieutenant F. L. Martin's testimony may be properly interpreted as denying he talked to Hammer's father and brother on May 13. Lieutenant F. L. Martin said he had not been assigned to the case on May 13 and his only activity on May 13 relating to Hammer's case was the participation in the search of Hammer's home.

Hammer's father talked with chief Peach on the street later in the afternoon of May 13, but he did not go into police headquarters. He saw Hammer on the afternoon of May 14 which, according to his testimony, was the first opportunity he was afforded to see his son.

Hammer "anything that he stated to me could be used for or against him in Court". He questioned Hammer until 2:15 a.m. on May 14. At 12:30 a.m. he asked Hammer "if he felt all right to continue" and Hammer "stated yes". Lieutenant Mapes said that he terminated the interview at 2:15 a.m. on May 14 "because he [Hammer] appeared tired to me even though he stated it was all right to continue".

Lieutenant Mapes questioned Hammer about many different complaints during the night of May 13-14, using the police files of unsolved crimes. Lieutenant Mapes testified:

"... I would have the complaint ... before me. I would question him with relation to it and I would give him the complaints, the date and time it happened, where it happened and I would ask him, 'now, what is your version of this complaint? Did you or did you not do this' and he would relate to me what he did do.

"COURT: He would just relate off to you what he did?

"A. Yes, and in the beginning of the interview he said he was going to tell the truth. He had not told the truth earlier that day but he was ready to tell the truth now and was going to. That's the basis under which I had to talk to Mr. Hammer."

Hammer apparently signed or initialed incriminating statements during this interview. The record does not disclose whether any of these statements related to this case; none was admitted in evidence.

Lieutenant F. L. Martin, who was assigned to Hammer's case on May 14, began his questioning at about 9:00 a.m. Lieutenant Martin "advised him at that time that he didn't have to make any statements unless he wanted to but any statement that he did make could be used as evidence either for or against him in Court". Lieutenant Martin told Hammer also "if he employed an attorney he could talk with him anytime he wanted to", but Hammer never requested an attorney—"he said he couldn't afford it".

Between 10:00 and 11:30 a.m. on May 14, Hammer dictated, read and signed a statement concerning this case. This is the statement in controversy, admitted in evidence over objection by Hammer's counsel. It reads:

"After being advised of any statement that he made could be used as evidence either for or against him in Court, James C. Hammer, while [sic] male, 25, of 10371 Warwick Boulevard made the following statement to Lieutenant F. L. Martin and Sergeant H. T. Williams in the Detective Bureau on May 14, 1964 at 11:20 a.m.

"On Tuesday, May 12, 1964, I left home about 6:30 p.m. I

walked down to the Hilton pier. Then I started walking down the beach towards the shipyard. When I got to the big ditch at Huntington Park I went up over the bank and I walked through Huntington Park towards Ferguson Park. I walked around Ferguson Park for a little while. About 8:30 p.m. I arrived at 225 Revere Street. I was wearing a Navy blue sweatshirt with a hood. I could see that the front door was open but the screen door was closed. I saw a light burning in the living room but I did not see anyone in the house. I pulled the—the hood down that was attached to my sweatshirt. I tied a white handkerchief over my face and then I pushed the hood back over my head. I was carrying my hunting knife in my right rear pants pocket. I walked up to the front door and pulled the screen door open and walked inside the living room. I did not see anyone. I walked over to a hallway. I met a white woman walking down the hall.

"This woman screamed and asked me what I wanted. I pulled my hunting knife out of my right rear pocket. I said, 'shut up and give me your money'. She said, 'I don't have any.' I said, 'if you don't have any money we will go to bed.' She then said, 'no, we won't.' Then this woman walked over to me and grabbed a hold of my knife. I said, 'let go of the knife. It is not worth it.' She let go of the knife and stepped back. I turned and walked out the back door. I walked up to Warwick Boulevard; then I walked north on Warwick Boulevard towards Hilton. I moved from one side of the street to the other side of the street, on several occasions. I was arrested by police on Hopkins Street about three houses off Warwick Boulevard. Signed, James C. Hammer."

Hammer gave additional statements to lieutenant F. L. Martin on May 14, admitting his guilt or involvement in eight other crimes. Describing the questioning on May 14, lieutenant Martin said:

"We would—well, for example, we would pick a case and he's [sic] say, yes, he done that. So in each case he was warned of his statements right on down the line. Then he would tell me about how he done it. . ."

" * * *

"During the day we would be talking about one thing and another. I mean he was so truthful about the thing that all I had to do was just show him the case. I'd let him read them [files of unsolved crimes] and he'd say 'no'. I didn't even fool with the case no more. I laid it aside."

Hammer made no objection to the length of the questioning. Lieutenant Martin said that Hammer talked willingly; for instance, after dinner on the evening of May 14, Hammer "wanted to stay and talk some more".

Hammer disputed the police officers' testimony in certain respects.

Hammer testified that he requested but was denied permission to make a phone call. He said he asked permission to call his father to tell him what had happened and to ask his father to give this information to his wife. This request, he says, was made of sergeant Calhoun and lieutenant Hiser about five minutes after he was brought to police headquarters on the night of his arrest.

He testified that lieutenant F. L. Martin told him on the morning of May 14 that "I [Hammer] couldn't afford to hire an attorney to represent me, being as all the cases were against me, it was so much, it would cost me that I didn't have. He told me just to wait and let the Court appoint me an attorney."

Hammer testified that he was never advised of his right to remain silent, and that he did not read the statements written by lieutenant F. L. Martin before signing them.

Hammer indicated by his testimony that he ate less than the police officers said he ate. But he admitted he was not denied any request for food.

The trial judge, who heard the evidence without a jury, was justified in rejecting Hammer's testimony that conflicted with the police officers' testimony. Hammer did give certain testimony, however, that was uncontradicted. This testimony, concerning a threat made by chief Peach on the night of May 13, will be outlined later.

Defendant's counsel contend that the "failure to afford him [Hammer] the opportunity to consult an attorney or to assign counsel to represent his interest" before the taking of the incriminating statement, violated Hammer's constitutional rights. They rely upon *Escobedo* v. *Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.ed.2d 977 (1964).

The majority opinion in *Escobedo* provoked a flood of comment, beginning with the three dissenting opinions. Certain writers, including the dissenting judges, view the decision as foretelling a much broader constitutional right to counsel than was announced by the holding on the facts presented in that case. Some view the decision as foretelling the court-ordered demise of effective police investiga-

tion of crime. Be that as it may, we take the majority opinion at its word:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer*, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright*, 372 U.S. at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Emphasis supplied) (378 U.S. at 490-491, 84 S.Ct. at 1765, 12 L.ed.2d at 986)

"* * *

"Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' *Spano* v. *New York*, 360 U.S. 315, 327 (Stewart, J., concurring), by gathering information from witnesses and by other 'proper investigative efforts.' *Haynes* v. *Washington*, 373 U.S. 503, 519. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, *under the circumstances here, the accused must be permitted to consult with his lawyers.*" (Emphasis supplied) (378 U.S. at 492, 84 S.Ct. at 1766, 12 L.ed.2d at 987)

Before Escobedo made an incriminating statement, he requested but was denied permission to consult with his lawyer. Escobedo had retained a lawyer, who was at police headquarters seeking permission to see him. Hammer had not engaged counsel, and the evidence amply supports a finding that he made no request for permission to call or consult with counsel. Also, the police did not warn Escobedo of his right to remain silent. Lieutenant F. L. Martin testified positively that he so advised Hammer before the incriminating statement was taken.[3] We hold *Escobedo* v. *Illinois*, *supra*, inapplicable to this case.

---

(3) We do not interpret the Fifth and Fourteenth Amendments to the Constitution of the United States as requiring a warning to an accused that he has the right to remain silent as a condition to the admissibility of an incriminating statement. *Biddle* v. *Commonwealth*, 206 Va. 14, 141 S.E.2d 710 (1965).

We find no provision of the Constitution of the United States or the Constitution of Virginia that required the police officers in this case to halt the interrogation and bring in counsel for Hammer before they took his statement. To lay down a rule requiring such halting of interrogation and bringing in of counsel would, in our opinion, unjustifiably expand the rights afforded to the accused by both Constitutions, and would adversely affect the power of the police to investigate an unsolved crime. We decline the invitation to extend *Escobedo* by making it applicable to this case.

*Massiah* v. *United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.ed.2d 246 (1964), involving an incriminating statement made by the accused in the absence of his counsel, is also factually distinguishable from this case. The statement was made by Massiah after indictment and without knowledge that his statements were being monitored by the police. *Cooper* v. *Commonwealth*, 205 Va. 883, 140 S.E.2d 688 (1965), which involved a statement made after indictment, is similarly distinguishable. Furthermore, the opinion in *Cooper* expressly points out "We do not mean to say that in all cases counsel must be present when a confession, admission or incriminating statement is made by an accused in order that this evidence be admissible against him in a criminal prosecution." 205 Va. at 892, 140 S.E.2d at 694.

Hammer's counsel raise the question whether Hammer was legally held in custody when he made his incriminating statement on May 14. The police officers had the legal right to arrest Hammer on the night of May 12, even though no warrant had been issued, because they had reasonable cause to believe he had committed a felony. See *Williams* v. *Commonwealth*, 142 Va. 667, 128 S.E. 572 (1925); *Hill* v. *Smith*, 107 Va. 848, 59 S.E. 475 (1907); *Muscoe* v. *Commonwealth*, 86 Va. 443, 10 S.E. 534 (1890). Counsel apparently recognize the legality of the arrest, but they seriously question the legality of Hammer's detention after he was "booked" at 3:20 a.m. on May 13.

However, Hammer was brought before the municipal judge at 9:00 a.m. on May 13.[4] Hammer was recommitted to jail on May 13 after the municipal judge had continued his preliminary hearing until May 22. Code § 19.1-102 required the judge to recommit him

---

(4) Counsel do not rely upon *Winston* v. *Commonwealth*, 188 Va. 386, 49 S.E.2d 611 (1948), but we will nevertheless point out the distinguishing features of that case. Winston, who had been arrested without a warrant on a charge of driving while intoxicated, was held in jail from 4:30 p.m. until 9:00 p.m., when he was

to jail, unless the judge found that only a light suspicion of guilt existed or he saw fit to release him on bail.[5] There is no suggestion that the judge found only a light suspicion of guilt or that any request was made for bail. We hold that Hammer was legally detained when he made the incriminating statement.

Next, Hammer's counsel point out that no warrant had been issued against him when he gave the incriminating statement, and they contend Hammer was then ignorant of the charges against him. They argue that the admission in evidence of an incriminating statement made under those circumstances deprived Hammer of due process of law. It is difficult to believe, in view of the facts that have been recited, that Hammer did not know what he was charged with. Moreover, he admitted that he was advised of the charges when he was "booked" on May 13. When asked "when were you advised of why you were taken into custody and for what purpose you were taken into custody?" Hammer answered: "I was not advised until approximately 3:00 o'clock on the morning of the 13th. * * * When I was finally booked."

We now turn to the question whether Hammer's incriminating statement was obtained by duress.

Admittedly, he was subjected to prolonged questioning. Never-

brought before a judicial officer. During that period, he asked to be taken before the proper official so that he might be admitted to bail, but this request was denied because the arresting officer considered him "too drunk" to be bailed. We held the detention until 9:00 p.m. illegal. The law authorizes judicial officers to determine whether or not an accused should be admitted to bail. The police officer and jailer improperly substituted their discretion for the discretion of a judicial officer. Also, Winston was deprived of the right to secure material evidence to support his claim of sobriety. The evidence showed that when he was released, a physical examination would have been useless and ineffectual.

There is no evidence that Hammer requested to be released on bail, nor is there any indication that he could have procured material evidence but for his detention. Moreover, as pointed out in *McHone* v. *Commonwealth*, 190 Va. 435, 57 S.E.2d 109 (1950), "What is reasonable promptness [in bringing an accused before a judicial officer] is necessarily a question of fact, depending on the circumstances of each case . . ." The circumstances in this case are quite different from those in *Winston* v. *Commonwealth*, *supra*. For example, Hammer was held upon suspicion of many serious crimes, not merely one offense. We find that under the circumstances of this case Hammer was brought before a judicial officer with reasonable promptness.

(5) Va. Code Ann. § 19.1-102 (Repl. vol. 1960) provides: "A judge . . . may adjourn an examination . . . not exceeding ten days at one time, without the consent of the accused. . . In such case, if the accused be charged with a felony, unless it be a case in which only a light suspicion of guilt exists, he shall be committed to jail; otherwise he may be recognized for his appearance at the time appointed for such further examination or trial, or for want of bail be committed to jail."

theless, the officers were performing their duty when they continued the investigation. They had reason to believe Hammer was involved not in one crime, but many crimes. In fact, Hammer later made incriminating statements relating to at least twenty-seven cases. Moreover, the testimony of lieutenant F. L. Martin supports the conclusion that Hammer talked freely and willingly, not that his statement was extracted from him.

Hammer himself did not testify that while under arrest he complained of mistreatment by the police officers. He did not say he made the incriminating statement on the morning of May 14 because he was tired. He said only that he was tired when he made the statement. He did not testify that at any time during his detention he asked for interruption of the questioning or for permission to go to bed.

Aside from Hammer's testimony about a threat made by chief Peach (which will be described in the next paragraph), the evidence presented the factual issue whether Hammer's statement was procured by duress. The trial judge was justified, on the basis of the facts that have been recited, in concluding that his statement was not procured by duress.

This brings us to the alleged threat made by chief Peach. Hammer testified that this threat was made in chief Peach's office on the night of May 13, when only chief Peach and he were present. Hammer testified that chief Peach referred to allegedly stolen articles found in the home of Hammer's parents. Then, according to Hammer's testimony:

> ". . . Chief Peach . . . told me that if I signed the statements—that they wanted that they wouldn't prosecute my mother and father and my wife and my brother on possession of stolen property. * * * That's the reason I signed them for that sole reason."

Chief Peach did not testify in this case, apparently because he was out of town during the trial, so Hammer's testimony in this regard is uncontradicted. This uncontradicted testimony requires reversal and remand under the authority of *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.ed.2d 513 (1963).

The defendant in *Haynes v. Washington, supra,* was arrested on suspicion of robbery. Haynes testified without contradiction that his several requests for permission to telephone his wife and an attorney were denied by the police, and he was told he would be allowed to make a telephone call when he had "made a statement

and cooperated with them [the police]"; Later he signed a confession, which was admitted as evidence against him. The Supreme Court of the United States held that the requirement of a confession, as a condition to permission to communicate with others, amounted to duress and, consequently, Haynes was denied due process of law by the admission of the confession in evidence.

According to the uncontradicted testimony, chief Peach required Hammer to make an incriminating statement as a condition to the chief's promise to refrain from prosecuting members of his family. This requires us to hold the incriminating statement inadmissible on the record now before us.

 Hammer's counsel argue against the admissibility of his incriminating statement on yet another ground. They say Hammer's home was searched during the early morning of May 13 pursuant to a "constitutionally defective" search warrant. They proceed from this premise to the conclusion that Hammer's incriminating statement was not admissible "because it was induced by the fact the authorities confronted him with evidence obtained as a result of an illegal search and seizure" of his home. Counsel cite *Fahy* v. *Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.ed.2d 171 (1963) to support this conclusion.

The defendants in *Fahy* and companion cases were charged with willfully injuring a public building, specifically of having painted swastikas on a synagogue. A can of paint and a brush, removed from a defendant's car after a search without a warrant, were admitted in evidence at his trial. Both the Supreme Court of the United States and the Connecticut Supreme Court of Errors assumed that this evidence was improperly admitted under *Mapp* v. *Ohio*,[6] because the evidence had been obtained by an illegal search and seizure. The Connecticut Court held this error harmless, but the Supreme Court reversed on the ground that it "was prejudicial and cannot be called harmless".

The Supreme Court set forth several reasons why the error was prejudicial. Only one is relevant here: " . . . the defendants were not allowed to pursue the illegal search and seizure inquiry at trial * * *. Thus petitioner was unable to claim at trial that the illegally seized evidence induced his admissions and confession. * * * [P]etitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence." (375 U.S. at 90-91 84 S.Ct. at 232, 11 L.ed.2d at 175)

---

(6) 367 U.S. 643, 81 S.Ct. 1684, 6 L.ed. 2d 1081 (1961).

Unlike Fahy, Hammer had the opportunity during the trial of his case to show that his incriminating statement was induced by being confronted with evidence seized at his home. Hammer admitted the seized articles had no connection with the charge against him in this case, and they were not introduced in evidence. Assuming *arguendo* that the search and seizure were illegal, we find no showing of a connection between the seized articles and the making of the incriminating statement, except in Hammer's testimony about the threat made by chief Peach to prosecute members of his family. Chief Peach's threat, and not the seizure of articles that were unconnected with this crime and were not introduced in evidence, is the basis for exclusion of the incriminating statement.

## II

Counsel also contend that Hammer was deprived of his constitutional rights because he had no preliminary hearing on the charges against him. Hammer signed a waiver of preliminary hearing on May 22.[7] Counsel contend the waiver was ineffectual because Hammer was without benefit of counsel, he did not know to what charges his waiver related, and he signed the waiver "at the urging of the authorities".

No authority has been cited to support counsel's contention that an accused has been deprived of due process of law if he is permitted to waive a preliminary hearing without advice of counsel.[8] We find that no denial of due process arises out of the waiver of a preliminary hearing in Virginia, even though the waiver was signed without advice of counsel. Moreover, there is no indication that Hammer's waiver of a preliminary hearing handicapped counsel in preparing for trial or in defending Hammer during the trial. The trial judge appointed counsel for Hammer after he was indicted, and they have been eminently effective in their representation both in the lower court and here.

---

(7) Va. Code Ann. § 19.1-163.1 (Repl. vol. 1960) provides that a person arrested on a felony charge shall not be denied a preliminary hearing unless the hearing is waived in writing.

(8) *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.ed. 2d 193 (1963), involved the right to assistance of counsel during a preliminary hearing, rather than the waiver of a preliminary hearing. The case turned on Maryland law respecting procedure at a preliminary hearing and the use at a criminal trial of the defendant's plea of guilty entered at the preliminary hearing. The defendant entered a plea of guilty at the preliminary hearing, before counsel was appointed. When ar-

We have already responded to the contention that Hammer did not know what he was charged with. The evidence fully supports the conclusion that he was advised of the charges and, moreover, he admitted he was advised of the charges when he was "booked" on the morning of May 13.

No evidence supports counsels' contention that Hammer waived a preliminary hearing "at the urging of the authorities". Hammer did not give his reasons for signing the waiver, when he testified in this case, and none of the witnesses testified that he was urged to sign a waiver.

Hammer's counsel argue he was denied due process of law because copies of the warrants, which were issued May 22, were not left with him as required by Code § 19.1-92.[9] But Code § 19.1-92 imposes a procedural rather than a jurisdictional requirement, and the failure to leave copies of the warrants with Hammer is not ground for reversal unless prejudice is shown. "The purpose of requiring a copy of a criminal process to be left with a defendant is to inform him of a specific charge made against him so that he may intelligently prepare his defense." *Dorchincoz* v. *Commonwealth*, 191 Va. 33, 36, 59 S.E.2d 863, 864 (1950); see also *Gooch* v. *City of Lynchburg*, 201 Va. 172, 110 S.E.2d 236 (1959). What has been said about Hammer's knowledge of the charges against him answers the argument that Hammer's defense was prejudiced because he did not receive copies of the warrants.

### III

Counsel raise several issues in addition to the constitutional issues which have been discussed.

Counsel argue that without the incriminating statement the testimony was insufficient to prove beyond a reasonable doubt that

raigned, he pleaded not guilty; but evidence of his guilty plea at the preliminary hearing was introduced at his trial, as permitted by Maryland law. The court held that a preliminary hearing is a critical stage of the criminal proceeding in Maryland, requiring assistance of counsel. Cf. *Pointer* v. *Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.ed.2d 923 (1965), involving the constitutional right to assistance of counsel at a preliminary hearing in Texas. The court held *White* v. *Maryland* not necessarily controlling because of the "significant differences in the procedures of the respective States [Texas and Maryland]". The opinion in *Pointer* states that, according to information furnished by the State, a plea of guilty or not guilty is not accepted at a preliminary hearing in Texas. In Virginia, the accused is not required to make a plea at a preliminary hearing, and if he should enter a plea of guilty, the plea is not admissible as evidence at his trial.

(9) Va. Code Ann. § 19.1-92 (Repl. vol. 1960).

Hammer was the person who entered the prosecutrix' dwelling on the night of May 12 with intent to commit rape. They ask us, therefore, to enter final judgment dismissing the charge against Hammer.

Hammer denied on the witness stand that he had entered the prosecutrix' apartment on the night of May 12. The prosecutrix positively identified him, however, as the person who entered her apartment on that night.

Hammer's counsel point to various bits of evidence to sustain their argument that the proof of identification was insufficient. As examples, they point to:

> The inconclusiveness of the prosecutrix' identification of Hammer's voice during the voice tests. The manner in which the "lineup" was staged on the night of May 12, particularly the fact that Hammer was in the same attire as at the time of his arrest whereas the officers were in different attire. The prosecutrix' admission, after she saw Hammer at police headquarters on the night of May 12, that he was older than she had thought. The prosecutrix' admission, when she testified in this case more than five months after May 12, that she did not remember whether she had described the pants worn by the assailant as lighter or darker than his sweatshirt. The testimony of a police officer that when the prosecutrix described the assailant to him on the night of May 12, she made no mention of the type of shoes he was wearing.

Also counsel argue that sergeant Calhoun arrested the wrong person on the night of May 12. They say Hammer gave good reason for running when sergeant Calhoun said "there he is" just before the arrest. He explained that he mistook sergeant Calhoun for young men who had made derogatory remarks to him earlier in the evening. Counsel argue that sergeant Calhoun should have followed up his investigation of another suspect. Sergeant Calhoun stopped a boy on Warwick boulevard just after he received a description of the assailant. He questioned this boy briefly, concluded on the spot that he did not fit the description, and never questioned him again.

Counsel no doubt presented these arguments vigorously at Hammer's trial. The trial judge heard the evidence without a jury. It was his function to determine the credibility of the testimony of the witnesses.

The evidence supported a finding that Hammer was the assailant. This finding is supported by the prosecutrix' positive identification

of Hammer as the assailant, the circumtances of his arrest, the clothing in which he was dressed at the time of his arrest, and the hunting knife found in the immediate vicinity of the place of arrest. We hold that the evidence, exclusive of Hammer's incriminating statement, was sufficient to sustain his conviction.

Counsel moved the trial court to dismiss the indictments against Hammer, which were returned by the grand jury on June 8, 1964, because of material variances between the indictments and the warrants issued May 22, 1964.[10] We find no error in the overruling of this motion. Hammer was brought to trial on the indictments, and variances between the warrants and the indictments did not affect the validity of the indictments. See *Benson* v. *Commonwealth*, 190 Va. 744, 58 S.E.2d 312 (1950), where the accused was indicted by the grand jury after a warrant issued against him charging the same offense had been dismissed.

We can dispose summarily of counsels' objections to rulings on the admissibility of certain evidence.

Counsel complain that Hammer was not permitted to testify as to his "schedule or routine" on the day he was taken into custody. The record shows, however, that he did testify concerning his actions during that period. Counsel complain also that the judge refused to admit evidence concerning the continued interrogation of Hammer after he gave the incriminating statement in this case. Again, the record shows that he did give testimony in this respect, and the trial judge commented on this testimony.

Lastly, counsel complain that Hammer's father was not permitted to state whether chief Peach advised him that charges might be made against him. Hammer's counsel contended the father's response "would be material if such a statement was communicated to this defendant . . ." There is no evidence, however, that the father communicated with Hammer before the incriminating statement was made.

For the reason assigned under Section I of this opinion, the judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*

(10) The three warrants charged attempted robbery, attempted rape and feloniously walking into the home of the prosecutrix. The three indictments charged felonious assault, rape, and entry into a dwelling with intent to commit rape and attempted rape. At the conclusion of the Commonwealth's evidence, the court merged the three indictments into one charge, entering a dwelling house with intent to commit rape.

EGGLESTON, C. J., and I'ANSON, J., concur in result.

SPRATLEY, J., concurs in result for reasons set forth in a separate opinion.

CARRICO, J., dissents for reasons set forth in a separate opinion.

SPRATLEY, J., concurring in result:

I agree that the judgment in each of the above numbered cases should be reversed; but I think that the reversal should be based principally on the ground that the confessions or statements of Hammer were inadmissible, because they were obtained as a result of the persistent, continuous and prolonged interrogation of Hammer (as set out in the majority opinion), in the absence of counsel, both before and after the proceedings against him had reached the accusatory stage.

In a new trial, it is highly probable that Captain Peach, an experienced and able Chief of Police, will deny that he made any threats against the family of the accused, or any promises of favor to him. If the admissions and confessions are again sought to be allowed in evidence, it is quite probable that Hammer will again petition this Court for relief, and in the event of denial thereof, will seek a hearing in a court which may look with more favor upon his prayers.

Having reached the conclusion that each judgment should be reversed, because of the admission of improper evidence, it is not necessary or appropriate that we decide whether the properly admitted evidence is sufficient to sustain conviction. At the new trial the evidence in the several cases may be quite different for various reasons. Each side may strengthen its or his case at that time. Consequently, the evidence is not properly before us now.

In the recent case of *Cooper v. Commonwealth*, (March, 1965) 205 Va. 883, 891, 140 S.E.2d 688, where the interrogation of the accused was much less extensive and rigid, we said, speaking through Mr. Justice Snead:

"It is true that Cooper was advised of his rights before he was examined and that no threats or inducements were made to him. It is also true that the record does not show that Cooper asked to consult with counsel, but the fact remains that he was not experienced in criminal procedure, his intellectual endowment was 'at the lower

limits of normal,' and his ability to function under stress was 'in a corresponding range.' He had been indicted for a capital offense and was subjected to a lengthy examination by a skillful police investigator who was seeking to obtain an admission or confession. The interrogation was no longer investigatory; it was accusatory. It cannot be successfully denied that the defendant needed the assistance of counsel during this stage of the proceeding."

It seems rather early to expect a change of our views.

Our determination in that case is supported by many decisions of the Supreme Court: *Hamilton* v. *Alabama*, 368 U. S. 52, 7 L. ed. 2d 114, 82 S. Ct. 157, where defendant was without counsel at the time of his arraignment; *Spano* v. *New York*, 360 U.S. 315, 3 L. ed. 2d 1265, 79 S. Ct. 1202, where there was a confession after a long and continued questioning; *White* v. *Maryland*, 373 U.S. 59, 10 L. ed. 2d 193, 83 S. Ct. 1050, where the right to counsel and a preliminary hearing were denied; *Gideon* v. *Wainwright*, 372 U. S. 335, 9 L. ed. 2d 799, 83 S. Ct. 792, where the right of an indigent defendant to counsel was upheld; *Escobedo* v. *Illinois*, 378 U. S. 478, 12 L. ed. 2d 977, 84 S. Ct. 1758, where a refusal to allow the defendant to confer with his counsel was involved; and *Massiah* v. *United States*, 377 U. S. 201, 12 L. ed. 2d 246, 84 S. Ct. 1199, where it was held that incriminating statements made by defendant under indictment, and surreptitiously overheard by a government agent, were inadmissible.

In *Escobedo*, the Court said, at page 488, in answer to the contention that the right to counsel should not be extended to a defendant prior to his indictment:

"This argument, of course, cuts two ways. The fact that many confessions are obtained during this period points to its critical nature as a 'stage when legal aid and advice' are surely needed."

Proceeding, the Court said, at page 492:

"(T)hat when the process shifts from investigatory to accusatory— *when its focus is on the accused and its purpose is to elicit a confession*—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." (Emphasis added.)

In *McLeod* v. *Ohio*, 381 U. S. 356, 14 L. ed. 2d 682, 85 S. Ct. 1556, the Court in a *per curiam* decision reversed the murder conviction of an indigent defendant, who had confessed to the police

in the absence of counsel, but who had never been represented by counsel, nor had requested the aid of counsel.

At the time the incriminating statements were made by Hammer, the interrogation was no longer investigatory. The proceedings had reached the accusatory stage. Hammer had been charged on the police blotter with fourteen felonies, and all of the cases, each naming a specific offense, had been placed on the docket of the municipal court. The interrogations were thus focused on the accused as a criminal, and the inquiries were continued without interruption for the express purpose of obtaining confessions. If Hammer ever needed counsel, he needed it at that critical period.

I would hold that the cumulative effect of Hammer's detention practically incommunicado for more than thirty-six hours, the continuous interrogation during that period, and the lack of the aid of counsel constituted a denial of his rights under the Constitutions of Virginia and the United States.

CARRICO, J., dissenting:

I dissent. I would affirm the conviction of the defendant.

The majority opinion reverses the conviction of the defendant because of an alleged threat by Chief Peach to prosecute members of the defendant's family if he did not confess. Such reversal, the majority says, is dictated because of the holding of the United States Supreme Court in *Haynes* v. *Washington*, 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. 2d 513.

I do not interpret the *Haynes* case as requiring the action here taken by the majority. In that case, the sole point relied upon by Haynes to void his confession was that he was told by the police that he would have to cooperate and sign a confession before he could telephone his wife to secure a lawyer for him. On that single point, the police officers, in their testimony, failed to contradict Haynes.

The Supreme Court held that the inability of the police officers to contradict Haynes on the sole factual issue involved in the case left his account of his interrogation "testimonially undisputed." The court ruled that the "confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities." 10 L. ed. 2d, at p. 520.

In the case before us, the situation is quite different from that

existing in the *Haynes* case. Haynes, from the time of his arrest until his conviction, never denied his guilt. Here, although the prosecutrix positively identified the defendant as her assailant and although he originally confessed to the crime, he denied his guilt on the witness stand. And on every material point in the case, save the Peach incident, the defendant, unlike Haynes, was contradicted by direct testimony.

The trial judge, sitting without a jury, had the authority and the obligation to determine the credibility of the witnesses and the weight to be given their testimony. The judge saw the defendant and heard him testify. That the judge concluded that the defendant lied in his testimony is obvious from the record.

The trial judge, in his oral opinion, said of the defendant's testimony relating to the circumstances surrounding the giving of the confession that he found it unworthy of belief. The judge, commenting upon the defendant's testimony that he had not read the twenty-seven confessions signed by him, said, "that's a little incredible." The judge, noting that the defendant had produced witnesses who testified that they would believe the defendant under oath, said, "I'm afraid I can't go along with that."

It is true that no one directly contradicted the defendant's testimony as to the conversation with Chief Peach. But the trial judge was entitled to conclude that the defendant, having testified untruthfully as to every other material point in the case, also lied about the conversation with Chief Peach.

The defendant, himself, could not even tell a straight story about his conversation with Chief Peach. He first said that Chief Peach told him that *his parents* would be prosecuted if he did not confess. Later in his testimony, he said that *his mother, father, wife and brother* were all included in the Chief's threat.

The insincerity of the defendant's testimony leaps out from the printed pages of the record before us, just as the falsity of his story appeared obvious to the trial judge. The fallaciousness of the defendant's statements, together with the testimony of the police officers, justified the trial court in concluding that no threat was made to the defendant by Chief Peach. I cannot, therefore, agree with the decision of the majority to reverse the judgment of the trial court because of such alleged threat.

Nor do I agree with the views expressed in the concurring opinion of Mr. Justice Spratley. I note his admonition that it is our duty

to adopt the rulings of the United States Supreme Court, notwithstanding our disagreement with the reasoning or principles upon which such rulings are based.

My quarrel with the views expressed in the concurring opinion stem not from any disagreement with the rulings of the United States Supreme Court, but from the fact that the concurring opinion goes beyond what those rulings require.

It is true that in the *Escobedo* case, the United States Supreme Court said "that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, *under the circumstances here*, the accused must be permitted to consult with his lawyer." [Emphasis added.]

What were the circumstances there, in *Escobedo?* The accused was represented by a lawyer. When the police undertook to interrogate Escobedo, he asked to consult with his lawyer. That request was refused. Escobedo's lawyer, at that very moment, was at police headquarters asking to see his client. That request was also refused. The confession that resulted from the ensuing interrogation was held to be inadmissible—not a surprising result under the circumstances.

But those circumstances do not exist in this case. As the majority finds, Hammer had not engaged counsel and he made no request to call or consult with counsel. He was advised of his right to remain silent. The evidence shows that Hammer was asked if he wished to make a telephone call, but made none. Before the confessions were secured, the municipal judge advised Hammer that the charges against him were serious and that he was entitled to a continuance so that he might make whatever arrangements he thought necessary for trial. The judge also advised Hammer "with relation to an attorney."

The views of the United States Supreme Court are in such a transitory state in the field of criminal law, particularly with regard to confessions, that I am opposed to extending the loose language of the *Escobedo* opinion to any set of circumstances beyond those existing in the *Escobedo* case, until required so to do. It may well be, though hardly foreseeable, that even that court someday will reconsider, retrench and restore a semblance of order to the enforcement of the criminal law.

This court needs to apologize to no one for its zeal in protecting the rights of those accused of crime. But we should not be over-

zealous, we ought not disturb established principles and, above all, we must not, without sufficient reason, add to the confusion which others have created in the field of criminal law.

For the views herein expressed, I cannot add my vote to the reversal of the conviction of an admittedly guilty felon.