# COURT OF APPEALS OF VIRGINIA

---

**Record No. 0279-25-2**

---

RASHEED AZALI MELLS

v.

COMMONWEALTH OF VIRGINIA

---

Present: Judges Causey, Chaney and White

Argued at Richmond, Virginia

Opinion Issued April 21, 2026[*]

---

**FROM THE CIRCUIT COURT OF FLUVANNA COUNTY**
David M. Barredo, Judge

(Bryan J. Jones; Bryan J. Jones, LLC, on brief), for appellant.  Appellant submitting on brief.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

**MEMORANDUM OPINION BY**
**JUDGE DORIS HENDERSON CAUSEY**

Rasheed Azali Mells appeals the circuit court's denial of his motion to suppress evidence obtained as a result of an illegal search of a vehicle and coercive statements made to him and his daughter by law enforcement officials.  Finding no error, we affirm his convictions.

BACKGROUND

*I.  The Execution of the Warrant*

At dawn, on September 10, 2021, members of the Virginia State Police, U.S. Drug Enforcement Administration (DEA), Fluvanna Sheriff's Office, and the JADE Task Force (an anti-gang unit) executed a search warrant in Fluvanna County, at the home of Dwayne

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

Washington. The search warrant authorized the search of the residence at 2871 Bremo Road and "[a]ny vehicles located on the property" for firearms and drugs. Law enforcement arrived at 2871 Bremo Road in two armored trucks and a half dozen police cruisers.

The home was connected to the road by a gravel driveway. The driveway fed into a gravel parking area, situated between Washington's residence and the neighboring property. On the other side of the gravel parking area was a paved driveway that led to the neighboring property. Washington parked his vehicles in the gravel parking area, which was approximately a 35-second walk from the front door of his home.

Members of the Virginia State Police served the warrant, entered the home, and corralled the home's occupants—Washington, Rasheed Mells, and Mells's adult daughter, Angela Carr— in the gravel parking area. Mells and Carr were handcuffed with zip ties, while Washington was put in police-issued handcuffs. Multiple law enforcement officials also congregated in the gravel parking area throughout the hour-and-fifty-seven-minute encounter.

Multiple officers went into the home to execute the search warrant for the dwelling. Approximately eight to ten officers stayed in the gravel parking lot to execute the search warrant on Washington's vehicles. About five minutes into the encounter, while Deputy David Wells of the Fluvanna Sheriff's Office was standing in the parking area, Mells asked the officers if they had a blanket or jacket for his daughter because she was anemic and cold. Deputy Wells offered to try and find a jacket.

Deputy Wells attempted to retrieve clothing for Carr from a black Hyundai. The black Hyundai was parked in the gravel parking area, between Washington's two dump trucks and a white pickup. Wells testified that, while looking into the vehicle, he could see a firearm "wedged between the driver's seat and the center console." He discovered the gun was loaded with a .9-millimeter hollow point in the chamber. After securing the firearm, Deputy Wells

asked the group of detained individuals, "Whose car is this?" Mells responded that he "ha[d] been driving it." Deputy Wells then asked: "What about the gun in there?" Mells did not respond other than to ask, "What's in there?" They then searched his person.

Twenty minutes into the encounter, officers explained the contents of the search warrant to Mells and Washington. Mells and Washington were repeatedly told they were not under arrest. They were then read their *Miranda*[2] rights. Carr was sitting inside a police cruiser to stay warm at the time. Forty minutes into the encounter, officers learned that Mells had two previous, firearm-related felony convictions from 1994.

Before searching the inside of the vehicle, pursuant to the warrant, officers again asked Mells and Carr who the Hyundai belonged to, and Carr responded, "I drive it, but technically I don't own it." She later explained that it is a friend's vehicle that she frequently borrows. Officers then began searching the inside of the vehicle. DEA officers located a backpack with a second firearm, 13.89 grams of heroin, 2.85 grams of cocaine, and scales in it. At that point, Carr asked Officer Patrick Reed whether it was legal for police to enter her vehicle. He responded, "I'd have to see the search warrant." At the end of the search, an officer again asked Carr to whom the car belonged.

Later in the encounter, while examining the exterior of the vehicle, officers noticed the gas tank cover ajar and found a candy wrapper containing fentanyl pills tucked in the gas cap holder of the tank cover.

After the search inside the Hyundai—an hour and twenty-five minutes into the encounter—JADE Task Force Detective Matt McCall again asked Mells and Carr whether the car belonged to either of them. Mells asked, "Is this a sign that I need a lawyer?" McCall responded, "If you want a lawyer, you should probably ask for one. I can't make any promises.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

But honesty goes a long way. It's up to you. Otherwise, I could charge both of you." Mells responded, "Let her go, man." Mells then admitted to having illegal substances and explained where he had acquired them. He also admitted that both guns belonged to him.

*II. Procedural History*

Prior to trial, Mells filed a motion to suppress the gun found in the black Hyundai, arguing the search warrant did not cover the vehicle because—although the warrant called for a search of "all vehicles located on the property"—the target of the warrant was Dwayne Washington and his property. At the suppression hearing, Mells argued that the Hyundai was at the end of the driveway, "not anywhere near the house." Mells also argued that the lead officer, Deputy Wells, knew the vehicle did not belong to the target of the search warrant, and therefore, his search of it was unreasonable, as law enforcement could have applied for an additional warrant for the Hyundai if they believed probable cause existed for its search.

Next, Mells argued that he was improperly questioned by law enforcement when he was handcuffed by police with zip ties and surrounded by officers while the property was searched. Mells asserted that he was asked incriminating questions while he was not free to leave, without the constitutional protections of *Miranda*.

Finally, Mells argued that his confession regarding ownership of the firearms and drugs was coerced, and therefore, should be suppressed. He noted that his confession came only after Detective McCall told him that he and his daughter could both be charged with drug possession.

The trial court denied Mells's motion. First, relying on *Bare*, the trial court found that the Hyundai was well within the curtilage of the home and, therefore, covered by the warrant to search the home. *See Bare v. Commonwealth*, 122 Va. 783, 795 (1917) (defining curtilage as the space "habitually used for family purposes" like "the yard, garden or field which is near to and used in connection with the dwelling"). The trial court also held that the Hyundai was facially

- 4 -

encompassed in the search warrant because the warrant "include[d] all persons, vehicles, or out buildings located within the curtilage" of the property (relying on *Jeffers v. Commonwealth*, 62 Va. App. 151, 156 (2013)). Second, the trial court held that Mells was only temporarily detained when he spoke to Deputy Wells, as law enforcement never placed him in custody. Lastly, the trial court held that Detective McCall's observation that he could charge both Mells and his daughter with possession was insufficient to constitute coercion because officers merely made "a statement of fact" to Carr and Mells.

Following a bench trial, Mells was convicted of (1) possession of a firearm after being convicted of a violent felony, in violation of Code § 18.2-308.2(A); (2) possession of heroin with intent to distribute, in violation of Code § 18.2-248(C); (3) possession of fentanyl with intent to distribute, in violation of Code § 18.2-248(C); (4) possession of cocaine, in violation of Code § 18.2-250; and (5) simultaneous possession of a firearm and a controlled substance, in violation of Code § 18.2-308.4(B). The trial court sentenced Mells to an aggregate sentence of 75 years' incarceration, with 63 years and 12 months suspended. This appeal followed.

ANALYSIS

"In reviewing a trial court's denial of a motion to suppress, '[this Court] determine[s] whether the accused has met his [or her] burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error.'" *Rivera v. Commonwealth*, 65 Va. App. 379, 384 (2015) (third alteration in original) (quoting *Roberts v. Commonwealth*, 55 Va. App. 146, 150 (2009)). However, this Court considers de novo whether those evidentiary facts implicate a defendant's constitutional rights. *Hughes v. Commonwealth*, 31 Va. App. 447, 454 (2000) (en banc).

*I. Mells's Fourth Amendment Arguments*

The Fourth Amendment protects against unreasonable searches and seizures of persons, their dwellings, and the curtilage surrounding those dwellings. *See* U.S. Const. amend. IV. A defendant's claim that evidence was seized unconstitutionally "presents a mixed question of law and fact that we review de novo on appeal." *Murphy v. Commonwealth*, 264 Va. 568, 573 (2002). Courts give deference to the factual findings of the trial court but independently determine whether the evidence obtained meets the requirements of the Fourth Amendment. *Bolden v. Commonwealth*, 263 Va. 465, 470 (2002).

The Fourth Amendment requires search warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In turn, police may *only* search the premises facially described in a search warrant; nothing is to be left to the discretion of the officer executing the warrant. *Jeffers*, 62 Va. App. at 158. "[A] search may be as extensive as reasonably required to locate the items described in the warrant." *Kearney v. Commonwealth*, 4 Va. App. 202, 205 (1987) (alteration in original) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir. 1982), *cert. denied*, 464 U.S. 814 (1983)).[3]

---

[3] Magistrates must write "particularized" warrants that heed this reasonableness standard. *Jeffers*, 62 Va. App. at 156. While Mells does not challenge the validity of the search warrant or the magistrate's determination of probable cause, it is worth noting that the broadness of "any vehicles on the property" toes the boundary line set in *Jeffers*, 62 Va. App. at 157 ("[T]he critical element in a reasonable search is not that the *owner* of the property is suspected of crime but that there is reasonable cause to believe that the specific *things* to be searched for and seized are located on the property to which entry is sought."), and *Walter v. United States*, 447 U.S. 649, 657 (1980) (noting "indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment"). Because vehicles are transient, and their owners can come and go from a premises at any time, sweeping warrants with "any" and "all" language could impact innocent bystanders—who are not the targets of a search warrant—who find themselves in the wrong place at the wrong time. However, given that (1) Mells did not challenge the warrant's scope, (2) the vehicle was within the curtilage of the dwelling, which *was* particularly described in the warrant, and (3) Mells gave Deputy Wells permission to enter the vehicle to find a jacket for Carr, we need not decide whether the "any vehicles on the property" language would be valid in other circumstances.

Generally, "the curtilage appurtenant to a dwelling may be described as the 'space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the *yard*, garden or field which is near to and used in connection with the dwelling.'" *Kearney*, 4 Va. App. at 205 (quoting *Patler v. Commonwealth*, 211 Va. 448, 451 (1970), *cert. denied*, 407 U.S. 909 (1972)). Generally, "a warrant authorizing the search of the dwelling is sufficient to justify the search of an occupant's vehicle parked within the curtilage." *Glenn v. Commonwealth*, 10 Va. App. 150, 156, 157 (1990) (finding that the curtilage of the dwelling "cover[ed] a vehicle parked in the driveway"); *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (noting driveways typically constitute curtilage, which the Fourth Amendment considers "to be 'part of the home itself'").

Washington's home was particularly described in the search warrant, so a search of its curtilage was also authorized. Beholden to the principle established in *Kearney* and *Glenn*, the Hyundai was clearly within the curtilage of Washington's home because it sat in the gravel parking lot that was a part of Washington's driveway, in the yard of the home, a mere 35-second walk to the front door. Washington's property was not expansive; it was clear from the officers' body camera footage that the driver of the Hyundai had parked it there to visit Washington. Mells does not challenge the probable cause determination or the warrant's text. Given the Hyundai's presence in the curtilage of a particularly described dwelling and the warrant's express authorization to search any vehicle on the property, we find no error in the circuit court's denial of Mells's motion to suppress on the basis of the Fourth Amendment.

*II. Mells's Fifth Amendment Arguments*

The Fifth Amendment of the United States Constitution guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The question of whether a police officer violated a defendant's Fifth Amendment rights is a

- 7 -

mixed question of law and fact, with facts reviewed for clear error and law reviewed de novo. *Commonwealth v. Quarles*, 283 Va. 214, 219 (2012).

The Fifth Amendment right against self-incrimination requires that criminal defendants receive the *Miranda* warning before being asked questions by law enforcement officials. *See Miranda v. Arizona*, 384 U.S. 436, 467 (1966). For *Miranda* to apply, the defendant must undergo an in-custody interrogation. *Id.*

First, we must ask whether Mells was "in custody" under the Fifth Amendment. To evaluate whether a suspect is in custody, we ask "how a reasonable person in the suspect's situation would have understood his circumstances." *Dixon v. Commonwealth*, 270 Va. 34, 40 (2005). The trial court held that Mells was only temporarily detained and was not in custody, as defined under the *Miranda* standard, because "a warrant to search . . . carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Jones v. Commonwealth*, 23 Va. App. 93, 98-99 (1996) (alteration in original) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)). However, law enforcement went beyond the "limited authority" to detain. Because he was handcuffed using zip ties and surrounded by a dozen law enforcement officials, Mells was in custody. Clearly, his freedom of movement was restrained.[4] A reasonable person would not have thought they were free to leave.

---

[4] Although the officer told Mells that he was not under arrest, our custodial analysis is not dependent on a formal arrest. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting an arrest required *either* the application of physical force or, where that was absent, submission to the assertion of authority); *Howard v. Commonwealth*, 210 Va. 674, 677 (1970) ("Ordinarily, an arrest is made by the actual restraint of the person of the defendant *or* by his submission to the custody of an officer." (emphasis added)). Instead, the relevant circumstances include "whether the suspect was physically restrained, whether firearms were drawn, whether there was physical contact between police and the suspect, . . . whether police told the suspect he or she was free to leave, whether police engaged in other incidents of formal arrest such as booking, . . . and whether more than one officer was present." *Hasan v. Commonwealth*, 276 Va. 674, 680 (2008).

We must next ask whether he was interrogated. Again, we find that he was. In *Emerson v. Commonwealth*, 43 Va. App. 263, 275 (2004), this Court affirmed the trial court's conviction of a defendant who was in custody during the execution of a search warrant of his home. We found he was not being interrogated, so the *Miranda* warnings were not required. *Id.* In that case, the defendant was handcuffed and sitting on his front porch while police executed a search warrant of his home. *Id.* at 268. The defendant was only wearing boxer shorts, and he requested a pair of shorts to put on. *Id.* An officer retrieved the pair described by the defendant and found contraband in one of the pockets. *Id.* at 269. When another officer presented the defendant with the shorts, he asked him "if these were the ones he wanted, and he said yes." *Id.* This Court ruled that, while the defendant was in fact in custody, the officer's question did not amount to an interrogation likely to solicit an incriminating response. *Id.* at 275.

Unlike in *Emerson*, Deputy Wells asking who owned the black Hyundai and the gun did constitute an interrogation because (1) it was reasonably likely to elicit incriminating information, because (2) police had found contraband before they asked Mells the questions. Officers knew asking about the gun was likely to elicit an incriminating response. Officers were there with the federal DEA agents, state police, and detectives from the anti-gang task force, who arrived in armored trucks to execute a search warrant specifically looking for illegal drugs and guns. At that time, Deputy Wells had seen the loaded firearm "wedged between the driver's seat and the center console." Because Mells was under custodial interrogation without the benefit of his *Miranda* rights, if Mells had made any statements regarding possession of a firearm, they would have been suppressed.

However, here, though the trial court erred in holding Mells had only been temporarily detained while the search warrant was executed, any such error was harmless beyond a reasonable doubt. *See Commonwealth v. Swann*, 290 Va. 194, 200 (2015) ("Code § 8.01-678

- 9 -

makes 'harmless-error review required in *all* cases.'" (quoting *Ferguson v. Commonwealth*, 240 Va. ix, ix (1990))); *Mooney v. Commonwealth*, 297 Va. 434, 437-38 (2019) ("The standard for an alleged constitutional error is whether the error was harmless beyond a reasonable doubt."). Mells did not answer the questions that Deputy Wells asked. Mells offered no other incriminating information before he was *Mirandized*. And Mells's acknowledgment that he had driven the car was irrelevant after his later, explicit confession that the drugs and firearms were his. Therefore, we cannot say the trial court erred in denying Mells's motion to suppress.

### III. Mells's Fourteenth Amendment Arguments

The Fourteenth Amendment guarantees due process of law by state actors. *See* U.S. Const. amend. XIV. Whether or not a statement is voluntary is a legal rather than factual question. *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995); *Miller v. Fenton*, 474 U.S. 104, 110 (1985). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Midkiff*, 250 Va. at 268 (citing *Miller*, 474 U.S. at 112). A reviewing court will look at whether those subsidiary factual findings are plainly wrong or without evidence to support them. *Secret v. Commonwealth*, 296 Va. 204, 225-26 (2018). Appellate courts must "also presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019).

"[T]he Fourteenth Amendment forbids the use of involuntary confessions" because "'important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.'" *Jackson v. Denno*, 378 U.S. 368, 385-386 (1964) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206-07 (1960)). A confession may be involuntary when garnered by threats to prosecute family

members of the defendant, if the family member's arrest is not supported by independent probable cause. *Hammer v. Commonwealth*, 207 Va. 135, 147-48 (1966) (establishing the standard); *Hill v. Commonwealth*, 52 Va. App. 313, 321 (2008) ("[A] desire to disentangle a family member from a good faith arrest does not render a confession involuntary."). However, case law indicates that the defendant's confession is considered voluntary if the family member's arrest is independently supported by probable cause. *Hill*, 52 Va. App. at 318.

In *Hammer*, the defendant's conviction was reversed and remanded for a new trial, when police threatened to prosecute the defendant's parents and wife for possession of stolen property if he did not make self-incriminating statements. 207 Va. at 147. The Court held that this uncontradicted threat to prosecute a family member compelled them to reverse and remand for a new trial. *Id.*

In *Hill*, after the defendant was arrested and booked, his sister was separately arrested for possession of drugs, which were found in a car that she and the defendant shared. 52 Va. App. at 317. Police went back to the defendant after arresting his sister and told him that "his sister could be in a lot of trouble and the more he explains, the better off they'd be." *Id.* This Court found there was no coercion because the police had probable cause to arrest the sister independently of her brother's alleged crimes. *Id.* at 322.

In the circumstances of the case before us, we cannot say that Mells has met his burden of establishing coercion. Similarly to *Hammer*, police threatened to arrest Mells's daughter if he did not confess. Detective McCall stated that, if nobody claimed ownership of the firearm and drugs found inside the Hyundai, both Mells and Carr could be jointly charged with their possession. However, like in *Hill*, law enforcement had probable cause to arrest both Mells and Carr at that point in the encounter. Mells and Carr both admitted to driving the vehicle and, at

different points, claimed ownership of the vehicle.[5]  And here, there was no evidence of further misconduct by law enforcement, as the circuit court found that "Mr. Mells and his daughter were standing side-by-side; the officer makes a statement of fact that he could charge both, and Mr. Mells then makes the statement, ['L]et my daughter go, and I'll take everything.  Everything is mine.[']"  Because Carr took ownership of the vehicle, the Court went on to say that "the statement was not coerced.  It was simply the officer making a [true] statement of the predicament of both the defendant and his daughter[,] that both could be charged."

Threatening to arrest someone's child could certainly become coercive, to the point of mandating reversal under different circumstances.  But because Carr's arrest was independently supported by probable cause, we are bound by *Hill* and, thus, cannot say Mells's confession was involuntary.

CONCLUSION

For the foregoing reasons, we hold that the trial court did not err by denying Mells's motion to suppress the evidence found in the search conducted pursuant to the search warrant at 2871 Bremo Road.  Consequently, his conviction is affirmed.

*Affirmed.*

---

[5] Ownership here means dominion or control of the vehicle.  The Hyundai legally belonged to a friend of Carr.