# Richmond

FRANK TIMOTHY COOPER v. COMMONWEALTH OF VIRGINIA.

March 8, 1965.

Record No. 5824.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Edgar K. Wells, Jr.,* for the plaintiff in error.

*W. P. Bagwell, Jr., Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for the Commonwealth.

SNEAD, J., delivered the opinion of the court.

At the June 1963 term of court Frank Timothy Cooper, defendant, was indicted for the rape of Jackie Friend, a female child four years old (Code, § 18.1-44) and on July 3, 1963, Cooper was tried upon the indictment. He was represented by counsel of his own choosing, entered a plea of not guilty and waived trial by jury. The trial court found the defendant guilty as charged and subsequently, after considering the reports of the probation officer and psychiatrist, sentenced him to confinement in the State penitentiary for a term of thirty years. We granted the defendant a writ of error.

Jackie Friend and her two-year-old brother, Dutsey, were residing with their maternal grandparents, Mr. and Mrs. James Burkes, in a trailer camp in James City county. Their mother, Mrs. Shirley Walker, had divorced her first husband, the father of the children, and was living in Norfolk at the time of the alleged offense.

At approximately 6:30 p.m. on May 17, 1963, Burkes returned to his trailer accompanied by Kelley Salyers and Cooper, the defendant. They brought with them a fifth of vodka and two six-packs of beer. The three men were sergeants in the United States Army stationed at Fort Eustis. Cooper had made two prior visits to the Burkes trailer and on one occasion had spent the night. Upon their arrival Mrs. Burkes prepared vodka drinks for herself and the men. They continued to drink until they had consumed the bottle of vodka and at least some of the beer. An argument developed between the Burkes. About 7 p.m. Mrs. Burkes put her young grandson Dutsey in bed, and at 8 p.m. she dressed Jackie in pajamas and placed her in bed. Shortly thereafter Jackie went to sleep. Cooper

complained of a headache and said he "didn't feel good," and Burkes told him to lie down. He lay down across the bed on which Jackie was sleeping.

Soon thereafter Mrs. Burkes left the trailer and walked to a store called "Mike's" where she ordered a beer, but before she had an opportunity to drink it her husband and Salyers appeared on the scene. She immediately proceeded to another place called "Ted's" where she ordered beer, but before she had a chance to drink it Burkes and Salyers arrived there. In the meantime, Cooper and Jackie were alone in the trailer. Mrs. Burkes then ran back to the trailer and when she arrived Burkes and Salyers, who rode in an automobile, had already returned. According to Mrs. Burkes, Cooper, Burkes and Salyers were in the trailer drinking beer, and Jackie was standing beside the front door crying. She estimated that about one-half hour elapsed from the time Cooper lay across Jackie's bed until she returned from the stores. Another argument developed between the Burkes and Mrs. Burkes threw a flower pot which broke a glass in the front door. She stepped on the broken glass and cut her heel which caused it to bleed.

As a result of the argument, Mrs. Burkes and the two children spent the night with Sergeant and Mrs. Dewey R. Taylor who lived across the street in a trailer. At Cooper's request, Sergeant Taylor drove him back to Fort Eustis around midnight.

The next morning, after Mrs. Burkes had returned to her trailer to prepare breakfast, she observed that Jackie was passing blood. Mrs. Burkes became excited and immediately called Mrs. Taylor who hurried over. Upon their examination of the child they concluded that she had been "molested". Burkes, who was on duty at camp, was called home and the child was taken to Dr. Constantine Saliba in Williamsburg. Dr. Saliba examined Jackie and testified that she was in "an acute shock state", was "very emotional and upset", and that "there was trauma to the anterior and posterior vaginal walls". He further stated "The trauma included blood collections and some swelling and there was some kind of penetration, * * *." On cross-examination he admitted that the penetration could have been "by any number of things."

At a preliminary hearing had in the James City County Court on May 21, 1963, the charge against Cooper was dismissed. On the night of May 23, Jackie was taken by her mother, Mrs. Walker, to State police headquarters in Norfolk. There, H. L. Mundy, an investigator for the Virginia State Police, arranged for Mrs. Walker

to question her child in detail concerning the offense allegedly committed by Cooper. Mrs. Walker and the child were left alone in a room. It was "bugged" and had a "two-way mirror" which enabled Mundy to hear the conversation and to see the parties without himself being seen. A tape recording was made of the entire conversation. Leading questions were asked and considerable prodding was done by the mother in an effort to get the child to talk about the incident. Many of Jackie's answers were incoherent, but she did make some damaging statements.

On May 24, the following day, Mundy interrogated Cooper at Fort Story after he had been advised of his rights. At the trial, Mundy was asked by counsel assisting in the prosecution:

"Q. I said, Mr. Mundy, did you or did you not ever in your interrogation of Cooper ask him why if he had committed such an offense he had indeed done so? Why had he committed this offense? Did you ask such a question?

"A. Yes. On several occasions I asked him. The first occasion was on May 24 at Fort Story. I told him that the little girl had told me what he had done to her, and that I would like to know why he had done it, and he never replied to me that he had done it, and I said that I felt like that the drink was a contributing factor to what he had done, but there were bound to be other reasons.

"And he raised his right hand and said, 'I swear I will never take another drink as long as I live.'

"I said, now you don't think that is the answer to your problem, and then he didn't answer *anymore* questions, or he wouldn't say anything again."

On June 10, the grand jury indicted Cooper for rape and he was incarcerated pending trial.

According to Mundy, on June 28, he took Cooper out of jail and led him to the sheriff's office where he interrogated him again. He testified:

"* * * I played this tape recording for Cooper, letting him hear the little girl telling her mother what he had done. And Cooper became upset, and I said, Cooper, I said, that little girl doesn't even know anything about sex, I said, she doesn't know, she wouldn't make this stuff up on you and tell nothing wrong, and he said, said it don't look like it, does it.

"I said, Cooper, just tell me why. I said I know it is bound to be some reason for it, why.

"And he half started crying and he said I do not know why.

\* \* \* \* \* \* \* \*

"Q. So far as Cooper was concerned, when he was confronted with all this he said I don't know why, is that right?

"A. At one time he started halfway to cry there and he said I don't know why. That was right after I played the recording for him.

"Q. He never at any time admitted that he had done anything to this child, is that correct?

"A. No, sir."

At this point in the trial the Commonwealth rested, and counsel for defendant moved to strike the Commonwealth's evidence. During the course of trial and before the motion to strike was made Jackie had testified for several hours in chambers. The court stated during argument on the motion that he did not think Jackie's testimony "establishes anything particularly"; that the "only thing I get from her was one sort of a nod at one stage of the proceeding", and that furthermore her testimony could not be considered "because she was never even subjected to cross examination." The court stated that if the Commonwealth had a case it was based upon Cooper's admission "I don't know why" and that the statement amounted to very little unless the court had knowledge of the contents of the tape recording. Over the objection and exception of defendant, the Commonwealth was permitted to reopen the case and Mundy testified as to the contents of the tape recording. This testimony was objected to on the ground that it was hearsay.

Mundy was asked on cross-examination if Cooper did not say during the interrogation on June 28 "I swear to God I didn't rape that little girl and you know it?" His response was: "No, sir. I asked him if he believed in God, and he said yes I do believe in God, and he raised his hand and he said I do swear that I didn't rape that little girl."

At the conclusion of Mundy's testimony the Commonwealth's motion to introduce the tape recording itself in evidence was sustained. The court said: "I believe that in fairness to the accused, really it would be fairer to him to have the recording played than take the witnesses version of what the recording says. Perhaps that is best." To this ruling counsel for defendant stated that he "would like the record to show my continuing objection". This objection was apparently on the ground that it was hearsay evidence. That portion

of the tape recording which was played to Cooper on June 28 was again played, and the record shows that the court reporter "found it utterly impossible to take down the utterances of the tape machine with any degree of accuracy" so that he could certify the utterances as being an accurate transcription.[1]

The Commonwealth again rested and the defendant renewed his motion to strike the Commonwealth's evidence. The motion was overruled and an exception was taken. Cooper offered no evidence in his behalf. The court stated "I think his admission, coupled with the abundant opportunity that he had, and coupled with the proof there had been penetration by some object, is sufficient." Whereupon, Cooper was found guilty of rape as charged in the indictment. His motion to set aside the judgment as being contrary to the law and the evidence was overruled.

This brings us to a consideration of the assignments of error. The defendant has resolved his assignments into these questions: 1. Did the court err in admitting in evidence (a) the testimony of Jackie Friend, (b) certain testimony of H. L. Mundy, and (c) the tape recording of the conversation between Jackie Friend and her mother, Mrs. Walker? 2. Did the court err by engaging in improper conduct during the trial of the case? 3. Did the court err in refusing to strike the Commonwealth's evidence and in refusing to set aside the judgment as being contrary to the law and the evidence?

■ Jackie was questioned at some length by the court and counsel to determine her competency as a witness. Over the objection and exception of defendant the court ruled that she was competent to testify. The court noted in its memorandum opinion that the child's testimony did not establish "anything particularly"; that had defendant moved to strike her testimony the motion would have been sustained "because the accused was unable to properly cross-examine the victim", and that even though her testimony was not stricken "the Court did not consider her evidence as to the offense". Thus, we find the defendant's contention that the court erred in admitting her evidence is without merit.

■ The questions of whether the court erred in admitting in evidence the testimony of Mundy concerning the contents of the

---

[1] Pursuant to a consent order of this court, entered after an appeal was awarded Cooper, that portion of the tape recording which was played at the trial was played before the judge, assistant attorney general, the Commonwealth's attorney and counsel for defendant. It was transcribed by a reporter with the assistance of Mundy and certified to us by the judge as an accurate description of the tape recording.

tape recording and in admitting in evidence the tape recording itself will be considered together. In the court below defendant objected to the admission of this evidence on the ground that it was hearsay. The court, in effect, ruled that since such evidence was not offered as proof of a fact asserted but as a predicate to the showing of defendant's reaction when the tape recording was played in his presence, the exception to the hearsay rule applied. *Owens* v. *Commonwealth*, 186 Va. 689, 698, 699, 43 S.E. 2d 895; *Dykeman* v. *Commonwealth*, 201 Va. 807, 811, 812, 113 S.E. 2d 867; 22A C.J.S., Criminal Law, § 734(2) p. 1081.

Here, the defendant for the first time contends that the evidence concerning his alleged admission was inadmissible because he was denied his constitutional right to the assistance of counsel at the time it was obtained. The Commonwealth takes the position that since the evidence was not objected to in the lower court on this ground and no specific error was assigned this court should not consider the point. For reasons stated *infra* we are of opinion that the ground here asserted should be considered on appeal.

In 3 Am. Jur., Appeal and Error, § 248, p. 33 it is said:

"In the exercise of its power to do so, an appellate court will consider questions not raised or reserved in the trial court when it appears necessary to do so in order to meet the ends of justice or to prevent the invasion or denial of essential rights. The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved, or the question is imperfectly presented. The fact that questions are insufficiently raised will not preclude their consideration by the appellate court in a capital case, especially where the conviction is based on a confession and admissions of the defendant, corroborated by circumstantial evidence only. * * *."

In Wharton's Criminal Law and Procedure, Vol. 5, § 2253, p. 509 this statement appears:

"An appellate court may, however, take cognizance of errors though not assigned when they relate to the jurisdiction of the court over the subject matter, are fundamental, or when such review is essential to avoid grave injustice or prevent the denial of essential rights." See also *Commonwealth* v. *Johnson*, 402 Pa. 479, 167 A. 2d 511; *People* v. *De Jesus*, 11 App. Div. 2d 711, 204 N.Y.S. 2d 607; *Garner* v. *State*, 78 Nev. 366, 374 P. 2d 525; *State* v. *Griffin*, 129

S.C. 200, 124 S.E. 81; *People* v. *Burson*, 11 Ill. 2d 360, 143 N.E. 2d 239; *People* v. *Jung Hing*, 212 N.Y. 393, 106 N.E. 105.

Rule 1:8, Rules of Court, provides in part:

"In civil and criminal cases, all objections to writs of every kind, pleadings, instructions, notices, the admissibility of evidence, or other matters requiring a ruling or judgment of the trial court, shall state with reasonable certainty the ground of objection, and unless it appears from the record to have been so stated, such objections will not be considered by this Court except for good cause shown, or to enable this Court to attain the ends of justice."

We consider it proper, under the facts and circumstances of this case, to apply the exception to the rule.

In 90 A.L.R. 2d p. 732 *et seq.* the author discussed the subject of and cases relating to "Admissibility of confession, admission, or incriminatory statement of accused as affected by fact that it was made after indictment and in the absence of counsel." In his preliminary observations and analysis he stated in part:

"Whether a confession, admission, or other incriminating statement made by a person accused of a crime, after he has been indicted or after an information has been filed against him, is rendered inadmissible by reason of the fact that it was made in the absence of counsel, appears to be a question which has been raised only since 1958. Since then this question has been given extensive treatment in a number of New York decisions, and it now appears to be the settled view in that jurisdiction (supported by at least four Justices of the United States Supreme Court) that a confession, admission, or other incriminating statement made by an accused person after he has been indicted is inadmissible if made in the absence of counsel.

"On the other hand, a contrary view appears to have been taken by the courts in a few cases which arose in other jurisdictions."

In *People* v. *Di Biasi*, 7 N.Y. 2d 544, 200 N.Y.S. 2d 21, 166 N.E. 2d 825, the defendant was indicted for murder and surrendered to the police by arrangement of his attorney. He was questioned by the police in the district attorney's office in the absence of his counsel, and he made certain incriminating statements. There was no showing that defendant asked for his lawyer; that he was denied permission to see him; or that he was coerced in any way. But the court said: "* * * We think this questioning was a violation of this defendant's constitutional rights and that the admission in evidence, over objection, of his admissions made during that questioning after indictment and surrender for arraignment was so gross an error as to require

reversal, regardless of any other question in this case." 7 N.Y. 2d at pp. 550, 551. In a concurring opinion Fuld, J. said: "The defendant had a right to the effective aid and assistance of the attorney who represented him. The fact that his attorney surrendered him for such arraignment in court could not possibly be regarded as a consent or invitation to secret interrogation by police or prosecutor or a waiver of fundamental rights. It matters not, therefore, that the defendant did not object to being questioned or insist on the presence of his lawyer. The damaging statements made by the defendant during the course of his illegal interrogation by the police and District Attorney should not have been received in evidence." 7 N.Y. 2d at p. 552. See also *People* v. *Waterman*, (1961) 9 N.Y. 2d 561, 216 N.Y.S. 2d 70, 175 N.E. 2d 445, 90 A.L.R. 2d 726; *Spano* v. *New York*, 360 U.S. 315, 3 L. ed. 2d 1265, 79 S. Ct. 1202.

According to the probation officer's report, Cooper is a married man and the father of two infant children. He does not have any prior F.B.I. criminal record. Since 1951 he has been a member of the U.S. Armed Forces and has served overseas part of the time. Prior to 1951 Cooper received honorable discharges, decorations and awards. The psychiatric report ordered by the trial court states that "His intellectual endowment is at the lower limits of normal and his ability to function under stress is in a corresponding range."

Counsel for defendant stated at the bar of this court and in his brief that he represented Cooper at the preliminary hearing and during the grand jury proceedings; that he was not present when the tape recording was made and had no knowledge that it was to be made; that he was not present when his client, Cooper, was taken from jail after he was indicted and questioned by Mundy relative to the contents of the tape recording, and that he was not notified that such examination would take place. The record does not contradict these statements of counsel and in some respects it confirms them.

It is true that Cooper was advised of his rights before he was examined and that no threats or inducements were made to him. It is also true that the record does not show that Cooper asked to consult with counsel, but the fact remains that he was not experienced in criminal procedure, his intellectual endowment was "at the lower limits of normal", and his ability to function under stress was "in a corresponding range." He had been indicted for a capital offense and was subjected to a lengthy examination by a skillful police investigator who was seeking to obtain an admission or confession.

The interrogation was no longer investigatory; it was accusatory. It cannot be successfully denied that the defendant needed the assistance of counsel during this stage of the proceeding.

We do not mean to say that in all cases counsel must be present when a confession, admission or incriminating statement is made by an accused in order that this evidence be admissible against him in a criminal prosecution. Each case must be judged on its own particular facts.

We only hold that under the facts and circumstances of this case the defendant was deprived of his constitutional right to the assistance of counsel, and that the trial court, therefore, committed prejudicial error in admitting in evidence the testimony of Mundy concerning the contents of the tape recording and in admitting in evidence the tape recording itself, all of which had a direct bearing on the meaning of his alleged admission "I do not know why."

In view of the conclusion we have reached it is not considered necessary to discuss the other questions raised.

The judgment appealed from is reversed and the case is remanded for a new trial in accordance with the views herein expressed if the Commonwealth be so advised.

*Reversed and remanded.*