# CIRCUIT COURT OF HENRICO COUNTY

Commonwealth of Virginia

    v.

Cedric Thomas Harris

August 13, 2007

BY JUDGE CATHERINE C. HAMMOND

Defendant moves to suppress statements made during a police interrogation. He claims that these statements are inadmissible evidence because his rights under the Constitution of the United States and the Constitution of Virginia (Fifth Amendment and the Sixth Amendment) were violated. The hearing on the motion was July 11, 2007. There follow my findings of fact and conclusions of law. References to a transcript (Tr.) are to the hearing conducted July 11, 2007. No transcript was prepared for the DVD recording of the interview of the defendant at the public safety building after his arrest.

On March 18, 2007, eighteen-year-old Rodrick Cousins, Jr., was shot and killed. During the investigation, the police suspected Cedric Harris. In late March, Investigator Hewlitt of the Henrico Police Department received a call from a local attorney, Keith Marcus. Mr. Marcus advised that he was representing Cedric Harris in the Cousins matter and that Mr. Marcus did not want the police to speak to Mr. Harris. (Tr. 13-14, 19, 20-21.)

Investigator Hewlitt testified that Mr. Marcus telephoned, referred to Cedric Harris as his "client" and advised the Investigator that Mr. Marcus' policy was not to allow his client to talk to the police. Defendant testified that he had retained Mr. Marcus and had met with him personally and paid him, before April 12, 2007, and that he had Mr. Marcus contact Investigator Hewlitt about this case. Defendant's testimony on this issue was not disputed. (Tr. 29, 32-33.)

On April 11, 2007, a Grand Jury indicted Cedric Harris on multiple felony charges, including first-degree murder. On April 12, 2007, three officers went to where Cedric Harris was working and told him that he was under arrest for the murder of Rodrick Cousins. Immediately, while he was being handcuffed, Mr. Harris said, "you have the wrong person." Investigator Hewlitt then read *Miranda* warnings from a card that he habitually carries. The Investigator told defendant "you have a right to remain silent; anything you say can and will be used against you in a court of law; you have the right to have an attorney here to represent you while you are being questioned; if you cannot afford to hire an attorney, one will be appointed to you at no cost to yourself." (Tr. 10.) "[Mr. Harris] was asked 'do you understand those rights' [and] 'he said yeah'." (Tr. 10.) They drove to the public safety building in Henrico, with Mr. Harris in the front passenger seat.

In the car, Investigator Hewlitt initiated conversation with Mr. Harris about the Cousins case. (Tr. 11.) Defendant responded, "maybe you need to holler at my attorney." (Tr. 12, 18.) Investigator Hewlitt asked Mr. Harris whether he was still represented by Mr. Marcus, but Mr. Harris did not respond. (Tr. 12.) There was no further conversation during the car ride, which took about ten or fifteen minutes.

When they got to the public safety building, Investigator Hewlitt began questioning Mr. Harris after giving *Miranda* warnings a second time. Investigator Hewlitt advised that Mr. Harris had a right to have an attorney present at the interview. A second Investigator was also present. The interview was recorded on a DVD. (Commonwealth's Ex. 1.) The recorded interview proceeded as follows.

At the beginning of the interview, Investigator Hewlitt asked Mr. Harris four times whether he understood his rights. The first time, Mr. Harris made no audible response. Nor did he shake his head in assent. Then Investigator Hewlitt made some observations about the case and what might have happened, and Mr. Harris denied any involvement. Then this exchange occurred:

> Hewlitt: Do you understand your rights?
> Harris: Man, just call my lawyer, man.
> Hewlitt: Do you understand your rights?
> Harris: Just [or let's] call my lawyer, that's all.
> Hewlitt: Do you understand your rights? That's all I need
> to know, yes or no?
> Harris: Hm.
> Hewlitt: Okay.

Investigator Hewlitt then commented on the case and the tragedy of Mr. Cousins' death and there was a conversation. When Investigator Hewlitt remarked "we've got probable cause right now to arrest you on the charges that you've been charged with." Mr. Harris asked, "what's probable cause?" Mr. Hewlitt replied, "probable cause is evidence to link you to this crime." Then Mr. Harris stated:

> If ya'll got evidence ain't no need for me to talk then. If ya'll got evidence, which I know I'm right, ain't no reason, ain't no need for me to talk; ya'll just wanna holler at my lawyer for real.

After that, Investigator Hewlitt said some more about the evidence and the different degrees of murder, and encouraged Mr. Harris to talk. During the back and forth between the Investigators and defendant, was this exchange:

> Harris: Ain't no need for me to talk. All I need to do is holler at my lawyer, so you say you contacted my lawyer?
> Hewlitt: Well he's called me.
> Harris: That's cool, so if ya'll got evidence man, ain't no need for me to talk.

Mr. Harris again denied involvement in the killing. The interview continued. About three minutes later, Mr. Harris in essence complained that the Investigators were twisting the facts, and said: "for real, for real, that's why I went and got a lawyer 'cause see how ya'll doin' now?" The interview continued. There was discussion of the night of Mr. Cousins' death, the preceding incident of shots fired into the home of Mr. Harris' mother, and what witnesses had said. About thirty minutes later, Mr. Harris admitted shooting Mr. Cousins and told the Investigators how it happened. About four minutes after this confession began, Investigator Hewlitt said, "earlier during the interview, you asked that, you said wanted to talk to an attorney; you understand your rights, right?" Mr. Harris answered that he did.

### Sixth Amendment Right to Counsel

Defendant argues that his statements should be suppressed under both the Fifth Amendment and the Sixth Amendment. Unlike a defendant's right to counsel under the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which does not arise until

affirmatively raised by the defendant during custodial interrogation, *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *Commonwealth v. Redmond*, 264 Va. 321, 568 S.E.2d 695 (2002), the Sixth Amendment right to counsel arises when adversary proceedings commence.

"The *Sixth Amendment* right to counsel is triggered 'at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'." *Fellers v. United States*, 540 U.S. 519, 523, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004) (*quoting Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)). Mr. Harris had been indicted by the Grand Jury before his arrest on April 12, 2007. His Sixth Amendment right to counsel had attached. "There can be no doubt that [the accused] had the [Sixth Amendment] right to have the assistance of counsel at his post-indictment interviews with law enforcement authorities." *Patterson v. Illinois*, 487 U.S. 285, 290, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988).

The nature of the Sixth Amendment right to counsel pretrial differs from the Fifth Amendment right because, after the accusation is made, the government has committed itself to prosecute the accused in an organized way. *Maine v. Moulton*, 474 U.S. 159, 170, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). "The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Id.* at 176. While it is clear that Mr. Harris' Sixth Amendment rights had accrued before he made his statements on the DVD, this does not mean that the police interview could not lawfully occur. The legal question presented is at what point in the adversary process does it become impermissible for the government to conduct private interviews with someone accused of a crime? The Supreme Court of Virginia faced a situation similar to the case at bar in *Cooper v. Commonwealth*, 205 Va. 883, 140 S.E.2d 688 (1965).

In *Cooper*, the defendant was suspected in the rape of a child. Cooper was represented by retained counsel during his preliminary hearing and the grand jury proceedings. 205 Va. at 891. At the preliminary hearing on May 21, the charge against Cooper was dismissed. *Id.* at 885. On May 23, an investigator for the Virginia State Police interviewed the victim and recorded the interview. *Id.* at 885-86. On May 24, the investigator interrogated Cooper, who was not in custody. *Id.* at 886. On June 10, the grand jury indicted Cooper and he was incarcerated. *Id.* On June 28, the investigator interrogated Cooper at the jail. *Id.* The investigator played the tape recording of the victim telling her story, and Cooper made a statement that was incriminating, but not a full confession. *Id.* During this interrogation, Cooper did not ask to consult

with his attorney. *Id.* at 891. Cooper's experience and intellectual function were limited. *Id.* at 891. The Court held that, although Cooper was advised of his *Miranda* rights before he was questioned and, although no threats or inducements were made and although Cooper did not ask to consult with counsel, he was deprived of his Sixth Amendment right to the assistance of counsel, and the testimony of the investigator should have been suppressed, along with the tape recording, all of which had a direct bearing on Cooper's statement. *Id.* at 892.

After the Supreme Court of Virginia decided *Cooper*, the United States Supreme Court addressed this question in *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986). Later characterizing the "prophylactic rule" announced in *Jackson*, the Court stated:

> In *Michigan v. Jackson*, the Court established a prophylactic rule that once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right – even if voluntary, knowing, and intelligent under traditional standards – is presumed invalid if secured pursuant to police-initiated conversation. We held that statements obtained in violation of that rule may not be admitted as substantive evidence in the prosecution's case in chief.

*Michigan v. Harvey*, 494 U.S. 344, 345, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990) (citation omitted).

In *Jackson*, the defendant Bladel[1] was arrested on suspicion of murder. 475 U.S. at 626. At his arraignment the next day, he requested that counsel be appointed for him because he was indigent. *Id.* at 627. An attorney was appointed. The police detective was present at the arraignment, so he knew that counsel was appointed for Bladel. *Id.* Before counsel found out about the appointment, the police Mirandized and interviewed Bladel at the jail. He confessed. *Id.* The United States Supreme Court held that Bladel's confession was inadmissible in the prosecution's case in chief. *Id.* Because defendant's right to counsel had attached and he asserted that right in his oral request for counsel at the arraignment, his subsequent decision to respond to police-initiated interrogation was not a waiver, even if it would normally meet the

---

[1] In the combined appeal in *Michigan v. Jackson*, there were two separate cases with two defendants, Jackson and Bladel.

standards of being knowing, intelligent, and voluntary. *Id*. at 636. "We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id*.

Two years after *Michigan v. Jackson*, the Supreme Court explained it in *Patterson v. Illinois*. In *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988), the defendant was "apprehended" and taken into custody on August 21. *Id*. at 287. He denied involvement in the murder. *Id*. at 287-88. He was held in custody. *Id*. at 288. On August 23, he was indicted. The police investigator who had earlier questioned Patterson went to the lockup and told Patterson he had been indicted and was being transferred from the lockup to the jail. Patterson then *initiated* conversation with the police officer about the case, saying, "why wasn't [another gang member] indicted, he did everything." *Id*. At this point, the police officer interrupted Patterson and gave him a "Miranda waiver form." *Id*. Patterson initialed each *Miranda* warning and signed the written waiver. After that he confessed to murder. In *Patterson*, the defendant relied on the *Jackson* decision to argue that the police were completely barred from approaching the accused, after his indictment, unless he was the one who initiated the discussion. *Patterson*, 487 U.S. at 291. The Court rejected this theory, pointing out that Patterson, unlike Bladel, made no expression of wanting counsel. *Id*. at 291. Instead, the Court analyzed whether Patterson, who had initiated the interview with the police, had waived his right to counsel under the Sixth Amendment. The Court found that Patterson had waived his Sixth Amendment right to counsel, as he had been advised fully of his *Miranda* rights, and executed a written waiver form before speaking with the police. *Id*. at 299-93. "As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296-97.

In order to apply these principles to the case at bar, weight must be given to two factual differences between *Michigan v. Jackson* and *Patterson v. Illinois*. First is the fact that, unlike the defendant Bladel in *Michigan v. Jackson*, Patterson was the one who initiated the interview with the police. Second is the fact that, unlike the defendant Bladel in *Michigan v. Jackson*, Patterson did not have a lawyer at the time he was interrogated by the police.

> We note as a matter of some significance that petitioner [Patterson] had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect. *See Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). The State conceded as much at argument. . . . Indeed, the analysis changes markedly once an accused even *requests* the assistance of counsel. *See Michigan v. Jackson, supra.*

*Patterson v. Illinois*, 487 U.S. at 290, n. 3 (emphasis in original).

In the case at bar, defendant is situated like the defendant Bladel in *Michigan v. Jackson*, where the prophylactic rule applied and no rights waiver could even be considered, that is at the time of the post-indictment interrogation, (1) Cedric Harris already had retained counsel in this case, (2) the police interrogator knew that Mr. Harris had retained an attorney in this case, and knew who he was, and (3) the police, not the defendant, initiated the interview. The only factual distinction between defendants Bladel and Cedric Harris is the manner in which each defendant "asserted" his Sixth Amendment right to counsel.

Where the defendant's right to counsel has attached but he has not made an assertion of his right to counsel, a waiver in response to police-initiated interrogation can be considered valid, provided it is knowing, intelligent, and voluntary. *Patterson*, 487 U.S. at 296-97. But if the defendant has asserted his right to counsel, no waiver can occur. *Jackson*, 475 U.S. at 636; *Patterson*, 487 U.S. at 291. Thus, the very narrow factual issue here is whether Mr. Harris "asserted" his right to counsel within the meaning of *Jackson*.

For purposes of *Jackson*, an "assertion" means some kind of positive statement or other expression that informs a reasonable person of the defendant's wish to deal with the police through counsel. *Jackson*, 475 U.S. at 626. This does not require a defendant to utter the magic words, "I want a lawyer," *Montoya v. Collins*, 955 F.2d 279, 283 (5th Cir. 1992), but he has to say something. *Id*. As the Court of Appeals points out in *Collins*, "the law gives a broad interpretation to a defendant's Sixth Amendment request for counsel. But interpretation, whether broad or narrow, is only required when there is a 'request' or an 'assertion' in the first place." *Id*. In *Jackson*, the defendant Bladel orally requested a court-appointed attorney at his arraignment before the interrogation began. *Jackson*, 475 U.S. at 627. In a

more recent case on the same point, *Michigan v. Harvey*, the defendant's "assertion" under *Jackson* was much less than a clear demand for counsel to be present. However, it triggered the prophylactic rule of *Jackson*.

In *Harvey*, the defendant obtained court-appointed counsel. Two months later, he initiated an interview with the police. Harvey said he wanted to make a statement, "but did not know whether he should talk to his lawyer." 494 U.S. at 346. The police said it was unnecessary, and Harvey signed a rights waiver form and "answered affirmatively" that he understood his constitutional rights. The statement about not knowing "whether he should talk to his lawyer" was the only "assertion" of his right to counsel that Harvey made. It was enough. The government in *Harvey* "concede[d] that the police transgressed the *Jackson* rule, because the colloquy between [the defendant] and the investigating officer [could not] be viewed as defendant-initiated interrogation." 494 U.S. at 349. The defendant's incriminating statement was suppressed for use in the government's case in chief but allowed for impeachment.

In the facts recited above, I find that Mr. Harris made an "assertion" of his desire for counsel to intercede within the meaning of *Jackson* and *Patterson*. He hired a lawyer because he was a suspect in this case. The police knew that. After being formally accused and before confessing, Mr. Harris made six separate references to his attorney, Mr. Marcus, who already had telephoned Investigator Hewlitt on behalf of defendant. Mr. Harris' first statement was "Maybe you need to holler at my attorney"; his second was "man, just call my lawyer, man"; his third was "just [or let's] call my lawyer, that's all"; his fourth was "ya'll just wanna holler at my lawyer for real"; his fifth was "all I need to do is holler at my lawyer, so you say you contacted my lawyer"; his sixth was "that's why I went and got a lawyer." Further, the police accepted these statements as a request for counsel.

At the suppression hearing, Investigator Hewlitt testified that he did not perceive a clear request for an attorney to be present during the interview (Tr. 19), but this testimony was different from his recorded statement during the interrogation. On the DVD Investigator Hewlitt said, "earlier during the interview, you asked that, you said wanted to talk to an attorney." Since the Investigator's recorded statement was nearly contemporaneous with the defendant's references to "his lawyer," it seems more accurate. Investigator Hewlitt believed that Mr. Harris wanted to talk to an attorney before confessing, and Investigator Hewlitt knew who that attorney was.

Based on the totality of these circumstances, I find that defendant Cedric Harris made the kind of assertion of his Sixth Amendment right to counsel that triggers the "prophylactic rule" in *Michigan v. Jackson*.

Accordingly, the police could not continue to interview Mr. Harris and the confession cannot be admitted in the Commonwealth's case in chief.[2] Having concluded that the law protects defendant Cedric Harris in this way, because he had retained counsel and the police interrogator knew it and he asserted his right to counsel after indictment and he did not initiate any discussion with the police, all before he made incriminating statements without counsel present, it is not necessary that I address the next issue, whether defendant waived his Sixth Amendment right to counsel. However, since the Commonwealth may wish to take an immediate appeal of this Court's ruling, I also find that the Commonwealth would fail to meet its burden to prove a waiver of the Sixth Amendment right to counsel.

It is true, as the Commonwealth argues, that Mr. Harris was properly warned and proper *Miranda* warnings sufficiently provide an accused with "the sum and substance" of the Sixth Amendment protections. *Patterson*, 487 U.S. at 293. The problem with the evidence respecting waiver is that the interview with Mr. Harris is missing any demonstration by the defendant that he understood his rights and gave them up. The Commonwealth has to prove a voluntary, knowing, and intelligent waiver of the Sixth Amendment right to counsel. *Michigan v. Harvey*, 449 U.S. at 348-49.

There are two pieces of evidence where Mr. Harris expresses some understanding of his rights after being warned, but they are slight. First is in the testimony of Investigator Hewlitt at the suppression hearing. The Investigator testified that the first time he read *Miranda* to defendant, at his workplace, and asked Mr. Harris if he understood, he said "yeah." (Tr. 10.) The second is in the DVD after they had driven to the public safety building. There Investigator Hewlitt gave the warnings again, but Mr. Harris only said something that sounds like "Hm." He did not say anything else in response. There is no other affirmative statement by Mr. Harris that he understood his rights until after the confession to killing Mr. Cousins. When Mr. Harris testified at the suppression hearing, he insisted that his request to Investigator Hewlitt was to have Mr. Marcus present during the interview. "Because, he [Hewlitt] knew, I mean, because I, that's why I called you [Marcus] for so I

---

[2] While this assertion by Cedric Harris is enough for the rule in *Michigan v. Jackson*, it may not be enough for the rule in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), or the subsequent Fifth Amendment cases, *Davis v. United States* and *Commonwealth v. Redmond, supra*. The test for invoking the right to counsel under the Fifth Amendment is not the same as the assertion of the right in the *Jackson* situation.

could be represented by you [Marcus] so, you [Marcus] can be there in my presence when I was being questioned and make sure that I wasn't getting badgered or nothing like that." (Tr. 30-31.)

The Commonwealth relies mainly on *Patterson v. Illinois* to argue that a rights waiver occurred. But a comparison to the Sixth Amendment rights waiver in *Patterson* illustrates the weakness of the proof in this case. In *Patterson*, the police officer gave the accused a "Miranda waiver form" containing "five specific warnings, as suggested by [the] Miranda decision." *Patterson*, 487 U.S. at 288. The accused initialed each of the five warnings. *Id*. Later the same day, accompanied by the state's attorney, police officers again interviewed the accused and went through the same procedure. *Id*. at 288-89. The accused confirmed that he understood his rights, and again he signed the waiver. *Id*. Nothing like the communication in *Patterson* happened in this case. Further, the defendant in *Patterson* did not make any indication of wanting the assistance of counsel. "Had [he] indicated he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden (unless [he] called for such a meeting)." *Id*. at 291. Here, the defendant did make several indications of wanting assistance from counsel, all weighing against the conclusion that he waived his Sixth Amendment rights before confessing.

For the reasons stated above, defendant's motion to suppress will be sustained. In view of this decision on the Sixth Amendment, there is no need to address Mr. Harris' Fifth Amendment claim.